# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 20-1970V

| | |
|---|---|
| DON SHIELDS,<br><br>            Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>            Respondent. | Chief Special Master Corcoran<br><br>Filed: November 26, 2024 |

*Sean Franks Greenwood*, The Greenwood Law Firm, Houston, TX, for Petitioner.

*Sarah Black Rifkin*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES**[1]

On December 23, 2020, Don Shields filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine administered on October 24, 2018. Pet. at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons described below I find that Petitioner is entitled to compensation, and I award **$95,000.00** for past/actual pain and suffering.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.  Relevant Procedural History

After completion of records filing and Respondent's medical review, the parties attempted to informally resolve this matter but were unsuccessful. ECF Nos. 26-30, 34-37. Petitioner thereafter submitted a motion for a ruling on the record regarding entitlement and damages on October 17, 2023. Mot., ECF No. 39. Petitioner argued that he meets the Table definition of a SIRVA and requested an award of $125,000.00 for actual pain and suffering. *Id.* at 12.

Respondent reacted to Petitioner's entitlement and damages contentions on November 17, 2023. Opp., ECF No. 40. Respondent argued that Petitioner has failed to establish that the onset of his injury occurred within 48 hours of the subject vaccination, and thus his Table claim must fail. *Id.* at 7. Otherwise, if Petitioner was found entitled to damages, Respondent argued that a lesser award of $75,000.00 was appropriate for past pain and suffering. *Id.* at 13. Petitioner did not file a reply thereafter. This matter is now ripe for resolution.

## II.  Petitioner's Medical History

Petitioner's medical history was non-contributory. *See* Ex. 3 at 15, 19, 34-36, 42-44; Ex. 5 at 50. At age 60, during a visit with his primary care provider ("PCP") for unrelated conditions, Petitioner received the subject flu vaccine on October 24, 2018, in his left shoulder. Ex. 3 at 38; Ex. 2 at 3; Ex. 9 at 3. Petitioner attested that "[a]fter the vaccination, [he] had severe pain in [his] left arm that developed overnight and persisted for over a month." Ex. 1 ¶ 3. He described his shoulder pain and stated it "felt like a poking needle sensation." *Id.*

Approximately one month post-vaccination (on November 26, 2018), Petitioner followed up with his PCP for unrelated conditions, but made no mention of his shoulder pain at this time. Ex. 3 at 49. He explains this omission in his affidavit, noting that the appointment was "to follow up on medication [he] was taking for a dermatologic condition." Ex. 1 ¶ 4. He also "thought the pain was a normal reaction to the vaccine and that it would eventually subside[.]" *Id.*

On February 5, 2019 (now roughly three-and-a-half-months post vaccination), Petitioner returned to his PCP complaining of "persistent left shoulder deltoid pain." Ex. 3 at 51. Specifically, Petitioner reported "continued left shoulder pain since getting [a] flu shot into left upper deltoid region, and describes a 'poking neddle' [sic] sensation to the area." *Id.* An examination of his left shoulder showed normal strength and full range of motion ("ROM"). *Id.* at 52. Petitioner was assessed with shoulder pain and was told to

take ibuprofen. *Id.* An x-ray performed the next day (February 6, 2019), revealed "[m]ultiple areas of nonspecific subchondral cystic change." *Id.* at 77.

Later that month, on February 21, 2019, Petitioner saw an orthopedist and reported a "3 month history of atraumatic left shoulder pain." Ex. 3 at 73. Petitioner felt that "his pain began after receiving a flu shot in the arm in November." *Id.* He explained that the pain was in his entire shoulder and that it was aggravated with reaching overhead and behind his back; he described popping and catching in his shoulder. *Id.* An examination revealed reduced active ROM, mild tenderness at the acromioclavicular ("AC") joint, and positive impingement signs. *Id.* at 74. The orthopedist reviewed Petitioner's x-ray results and opined the findings were consistent with mild AC joint arthrosis. *Id.* Petitioner was assessed with impingement syndrome and primary osteoarthritis ("OA") of the left shoulder. *Id.* He received a steroid injection and was referred to physical therapy ("PT"). *Id.* at 75.

Petitioner underwent an initial PT evaluation on March 6, 2019. Ex. 5 at 5. The injury date is inexplicably listed as "9/26/2017." *Id.* However, the chief complaint section states that "on Oct[.] 26, 2018[, Petitioner] received a flu shot and continued to notice L arm pain and soreness for over a month." *Id.* Petitioner noted he experienced a "minimal change in symptoms" after receiving his prior steroid injection. *Id.* He rated his current pain at a 6/10, with a range of 5-7/10. *Id.* The "mechanism of injury" was listed as "after an injection into the arm for the flu shot." *Id.* Upon examination, Petitioner exhibited positive impingement signs and "slight deficits in L shoulder ROM and strength," but his external rotation was better on his left side compared to the right. *Id.* at 6. Four weeks of PT (three times per week) was recommended. *Id.* at 7. By Petitioner's second visit on March 12, 2019, the injury date was changed to "10/26/2018." *Id.* at 10.

On March 28, 2019, Petitioner returned to his orthopedist's office reporting ongoing "pain with abduction and less with flexion." Ex. 3 at 69. Petitioner noted he had been attending PT twice per week but had been "experiencing pain with therapy and [was] not willing to attend as advised." *Id.* at 70. He demonstrated reduced ROM and received a second steroid injection. *Id.* at 69-70. Petitioner also agreed to attend PT as prescribed and to "be more aggressive with home exercises." *Id.* at 70.

Petitioner returned to his orthopedist on April 19, 2019, with a "deep, stabbing like pain in the anterior aspect of the shoulder with forward flexion and overhead activities." Ex. 3 at 66. The orthopedist noted that Petitioner's ROM "ha[d] improved to near normal" and he was able to perform daily activities with modifications. *Id.* A physical examination revealed "impingement symptoms" and tenderness over the left AC joint. *Id.* The orthopedist stated that Petitioner had "failed conservative treatment" and thus

3

recommended a left shoulder arthroscopy to treat his impingement syndrome and primary OA. *Id.* at 67.

Petitioner underwent an MRI of the left shoulder on May 2, 2019, which showed: 1) mild supraspinatus tendinosis with superimposed small high-grade bursal surface tear at the anterior tendon footprint; 2) a small posterior superior labral tear with associated small multiloculated labral cyst; 3) small fluid collection within the subacromial subdeltoid bursa; and 4) moderate AC arthrosis. Ex. 4 at 15.

During the 12th and final recommended PT session on May 15, 2019, Petitioner reported that his pain had "decreased slightly" but that he continued "to have pain in his left shoulder when he has to reach overhead." Ex. 4 at 16-17. In light of his completion of the recommended sessions, Petitioner was discharged "for further alternative treatment" and he agreed to continue at-home exercises. *Id.* at 17.

Mr. Shields followed up with his orthopedist on May 23, 2019, to go over his recent MRI results. Ex. 3 at 61. A physical examination showed full ROM, but pain with rotator cuff testing and forward abduction, along with tenderness at the AC joint and a positive cross chest abduction test. *Id.* The orthopedist felt that the MRI showed a "high-grade rotator cuff tear and moderate [AC] joint arthrosis." *Id.* at 62. The orthopedist maintained his previous assessment of Petitioner, with the addition of an incomplete rotator cuff tear or rupture of the left shoulder – for which arthroscopic surgery was again recommended. *Id.*

There is a subsequent five-month gap in Petitioner's treatment, with Petitioner not obtaining additional care until October 22, 2019, when he returned to his PCP for an annual physical. Ex. 3 at 53. Petitioner described his history of left shoulder pain and stated he felt it was "caused by 'the flu vaccine he got last yr [sic].'" *Id.* A physical examination was normal. *Id.* at 54. Petitioner stated that he was seeking a second opinion prior to getting surgery. *Id.* at 55.

On October 30, 2019, Petitioner sought a second opinion with another orthopedist. Ex. 6 at 30. Upon examination, Petitioner exhibited mild tenderness to palpation over the lateral aspect of the shoulder, but no bicipital groove or AC joint tenderness. *Id.* He also showed normal strength and his abduction and internal rotation were limited by pain. *Id.* The orthopedist agreed that given Petitioner's failure to improve with conservative measures, "surgical intervention would be a possibility for him." *Id.*

Petitioner ultimately opted to proceed with surgery and underwent an arthroscopic rotator cuff repair with xenograph patch augmentation, debridement of labral tearing,

subacromial decompression, and application of a connective tissue allograph on December 17, 2019. Ex. 6 at 14. During a follow-up call the day following his surgery, Petitioner reported he was "doing good." *Id.* at 6.

On January 7, 2020, Petitioner began post-operative PT. Ex. 5 at 50. He rated his pain at a 6/10, with a 10/10 at worst when "trying to sleep at night." *Id.* He also noted that his post-operative use of a sling and pillow "seem[ed] to irritate [his pain the] most." *Id.* Petitioner reported that he could not use his left arm, had "severe difficulty dressing," and was sleeping only three hours per night as a result of the pain. *Id.* Petitioner exhibited diminished ROM and flexibility on examination – but he had trouble relaxing for the examination itself. *Id.* The physical therapist noted that Petitioner was compliant with his HEP and recommended six weeks of treatment. *Id.* at 52.

Petitioner attended five additional PT sessions (six total) through January 24, 2020. Ex. 5 at 67. The records for Petitioner's last PT visit appear to contain entries from Petitioner's initial session in early January, including Petitioner's reported pain rating on a ten-point scale. *Compare id.* at 50, *with id.* at 67 (stating that Petitioner's pain was rated at a 6/10, with 10/10 at worst with sleep and use of his sling and pillow). Petitioner continued to demonstrate reduced ROM and restricted flexibility on examination. *Id.* at 67. The plan was to "continue [with the] current rehabilitation program" (with a note that Petitioner's care was being "transferred"); however, it does not appear that Petitioner returned to treatment for his left shoulder pain with PT or otherwise. *See id.* at 67, 69. Petitioner asserted that he was "required to suspend [his] treatment due to the COVID pandemic." Ex. 1 ¶ 20.

Mr. Shields did manage to seek treatment for acute issues as needed throughout 2020, 2021, and 2022. *See,* e.g., Ex. 10 at 11 (a March 21, 2020 PCP visit); Ex. 10 at 13 (an October 23, 2020 PCP visit); Ex. 10 at 18-19 (an August 16, 2021 PCP visit); Ex. 10 at 28 (a December 30, 2022 PCP visit). In fact, Petitioner received a repeat flu vaccine in his left shoulder during a visit with his PCP on February 18, 2022. Ex. 10 at 25, 33. He did not complain of left shoulder pain at any of these visits. *See id.* at 16, 24, 28, 31, 100, 102, 106, 112, 134.

In his affidavit, authored on December 17, 2020, Petitioner attests that he continued to experience pain in his left shoulder "from time to time." Ex. 1 ¶ 21. His persistent pain has prevented him from sleeping on the left side, grooming and dressing himself, and maintaining household and physical duties. *Id.* Specifically, he found it "unbearable" to move furniture, paint, play with his grandchildren and dog, do yardwork, and engage in activities (including ziplining, fishing, bowling, volleyball, and basketball). *Id.* He also explained his difficulty maintaining long-lasting relationships, as well as the

5

emotional and financial stress created by his injury. *Id.* Petitioner's children also authored witness declarations on Petitioner's behalf and generally attested that his left shoulder pain began "around thanksgiving of 2018" and in "the fall of 2018." Ex. 11 ¶ 2; Ex. 12 ¶ 2. No additional medical records or affidavit evidence has been filed.

### III.     Fact Findings and Ruling on Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

Section 11(c)(1) also contains requirements concerning the type of vaccination received and where it was administered, the duration or significance of the injury, and the lack of any other award or settlement. *See* Section 11(c)(1)(A), (B), (D), and (E). With regard to duration, a petitioner must establish that he suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. Section 11(c)(1)(D).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury.  *See* § 11(c)(1)(A)(B)(D)(E).

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may

7

be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### A. Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the QAI requirements for a Table SIRVA.

#### 1. Petitioner Has No Prior Right Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Respondent has not contested that Petitioner meets this criterion, and there is nothing in the filed evidence to suggest otherwise.

#### 2. Onset of Petitioner's Injury Occurred within 48 Hours of his Vaccination

A petitioner alleging a SIRVA claim must also show that he experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)), and that his pain began within that same 48-hour period (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)). Respondent questions whether Petitioner can establish this criterion. Nonetheless, the medical records preponderantly establish onset of injury close-in-time to vaccination and specifically within 48 hours of the subject vaccination.

Although his first recorded post-vaccination complaint of shoulder pain linked to the subject flu vaccine is from February 5, 2019 (over three months post-vaccination), Petitioner specifically stated at this time that he had experienced "continued left shoulder pain *since* getting [a] flu shot into left upper deltoid region." Ex. 3 at 51 (emphasis added). The single intervening medical visit before this date was for pre-existing and unrelated

8

issues, including skin lumps. *See id.* at 49. Petitioner could have reasonably mentioned shoulder-related complaints during this visit (as it was with his PCP whom he saw for his receipt of the subject vaccination), but his failure to do so on one occasion does not alone preclude a finding of Table-consistent onset.

Petitioner's relatively minor treatment delay itself also does not undermine his onset assertions. It is common for SIRVA petitioners to delay seeking treatment, thinking the injury will resolve on its own, especially since patients are often told by medical providers at the time of vaccination to expect some soreness and pain for a period of time after. And individuals also often misconstrue the nature of their injury, and therefore fail to inform treaters of all specific facts relevant to onset until later.

Indeed, I have found *greater* delays not to have undermined an otherwise-preponderantly-established showing of two-day onset. *See,* e.g., *Tenneson v. Sec'y of Health & Hum. Servs.*, No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), *mot. for rev. den'd,* 142 Fed. Cl. 329 (2019) (finding a 48-hour onset of shoulder pain despite a nearly six-month delay in seeking treatment); *Williams v. Sec'y of Health & Hum. Servs.*, No. 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2019) (noting a delay in seeking treatment for five-and-a-half months because a petitioner underestimated the severity of her shoulder injury). At most, the delay speaks to the extent of Petitioner's suffering – for his injury appears to have been manageable, with his use of self-care for over three months before professional medical assistance was sought.

Additionally, Petitioner affirmatively and repeatedly linked the onset of his shoulder pain to the October 2018 vaccination. *See,* e.g., Ex. 5 at 5 (a March 6, 2019 PT note stating that "on Oct[.] 26, 2018[, Petitioner] received a flu shot and continued to notice L arm pain and soreness for over a month."). While the date reported during that visit was, in fact, two days later than the subject vaccine, I do not find this to outweigh the other evidence in favor of 48-hour onset. Furthermore, the affidavit submitted by Petitioner corroborates the evidence contained in his medical records about onset. Ex. 1.

Although some reports in the medical records do not place onset squarely within the Table's two-day requirement (instead including only a general temporal relationship between onset of his injury and his subject flu vaccination), Petitioner consistently linked the two events. *See,* e.g., Ex. 3 at 53 (an October 22, 2019 note stating that his shoulder pain was caused by a flu vaccine he received "last yr" [sic]). Such reporting corroborates the contention made in the affidavit that Petitioner's pain began within 48 hours of vaccination and provides additional support for a close-in-time onset. While one of Petitioner's medical records mentions onset outside of the 48-hour window (in November 2018) (Ex. 3 at 73), I do not find that this singular entry contradicts the bulk of evidence in favor of Table onset.

Accordingly, and based upon the above, I find there is preponderant evidence that establishes the onset of Petitioner's left shoulder pain more likely than not occurred within 48 hours of vaccination, and thus within the Table timeframe.

### 3. Petitioner's Pain was Limited to his Left Shoulder

The third requirement for a Table SIRVA is that the pain and limited ROM are limited to the shoulder in which the subject vaccination was administered. 42 C.F.R. § 100.3(c)(10)(iii). Respondent has not contested that Petitioner meets this criterion, and there is not preponderant evidence in the filed record to suggest otherwise.

### 4. There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent has likewise not contested this criterion and there is insufficient evidence in the record to suggest it cannot be satisfied.

## B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly in his left shoulder on October 24, 2018, in Houston, Texas. Ex. 1 ¶ 2; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for his injury. Ex. 1 ¶ 23; Section 11(c)(1)(E) (lack of prior civil award). As stated above, I have found that the onset of Petitioner's left shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA. Additionally, it is not disputed that Petitioner has established the six-month severity requirement. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement).

Based upon all of the above, Petitioner has established that he suffered a Table SIRVA. Additionally, he has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## IV. Damages

The parties have also briefed damages in this case, which is limited to a request for a past pain and suffering award. Petitioner requests $125,000.00 for actual pain and suffering. Mot. at 12. Respondent proposes an award of $75,000.00 for past pain and suffering. Opp. at 13.

### A. Legal Standards for Damages Awards

In several recent decisions, I have discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within the SPU. I fully adopt and hereby incorporate my prior discussion from Sections III and IV of *Leslie v. Sec'y Health & Hum. Servs.*, No. 18-0039V, 2021 WL 837139 (Fed. Cl. Spec. Mstr. Jan. 28, 2021) and *Johnson v. Sec'y of Health & Hum. Servs.*, No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021), as well as Sections II and III of *Tjaden v. Sec'y of Health & Hum. Servs.*, No. 19-419V, 2021 WL 837953 (Fed. Cl. Spec. Mstr. Jan. 25, 2021). *See also Yodowitz v. Sec'y of Health & Hum. Servs.*, No. 21-370V, 2024 WL 4284926 (Fed. Cl. Spec. Mstr. Aug. 23, 2024) (discussing statistical data of compensation awarded in prior SIRVA cases to-date).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[4]

### B. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed, leaving only the severity and duration of the injury to be considered. In determining appropriate compensation for pain

---

[4] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

and suffering, I have carefully reviewed and taken into account the complete record in this case, including all medical records, declarations, plus all filings submitted by both Petitioner and Respondent. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

Citing five prior damages determinations (*Collado, Dobbins, Cooper, Binette,* and *Bruegging*),[5] Petitioner requests an award of $125,000.00. *See,* e.g., Mot. at 11-12. He asserts that he suffered a severe SIRVA, requiring "three surgical procedures (two administrations of a corticosteroid injection and one arthroscopic procedure to make four distinctive and concurrent surgical repairs)."[6] *Id.* at 11. As Petitioner "still suffers greatly from pain and limited use of his arm" despite his treatment with injections, PT, and surgery, he argues that his injury is akin to the cases he relied upon for support. *Id.* at 12-13.

Respondent, by contrast, maintains that an award of no more than $75,000.00 is appropriate. Opp. at 13. Petitioner had a "significant delay in seeking care," which encompassed an intervening visit with his PCP. *Id.* at 18. His treatment consisted of two steroid injections, two rounds of PT, and an arthroscopic surgery – after which he did not require "post-operative orthopedic care." *Id.* Respondent also argues that Petitioner has not received any "SIRVA-related treatment since May 2020" (15 months post vaccination). *Id.* He thus compares the facts of Petitioner's case to the petitioners in *Hunt* and *Felland*.[7] *Id.* at 16-18.

The filed record in this case establishes that Petitioner suffered a moderately-severe SIRVA overall, significant enough to require surgery but mild enough for his care to cease almost immediately thereafter (within one month of surgery). Particularly

---

[5] *Collado v. Sec'y of Health & Hum. Servs.*, No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for actual pain and suffering); *Dobbins v. Sec'y of Health & Hum. Servs.*, No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for actual pain and suffering); *Cooper v. Sec'y of Health & Hum. Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for actual pain and suffering); *Binette v. Sec'y of Health & Hum. Servs.,* No. 16-731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering); *Bruegging v. Sec'y of Health & Hum. Servs.,* No. 17-261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019) (awarding $90,000.00 for actual pain and suffering).

[6] Petitioner appears to misinterpret his receipt of two steroid injections for surgical procedures.

[7] *Hunt v. Sec'y of Health & Hum. Servs.,* No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 for past pain and suffering); *Felland v. Sec'y of Health & Hum. Servs.,* No. 20-406V, 2022 WL 10724100 (Fed. Cl. Spec. Mstr. Sept. 6, 2022) (awarding $100,000.00 for past pain and suffering).

probative is the evidence demonstrating Petitioner's delay in seeking treatment for over three months, subsequent treatment with over-the-counter anti-inflammatories, an x-ray (showing mild AC joint arthrosis), an MRI (indicative of a high grade rotator cuff tear and moderate AC joint arthrosis), two corticosteroid injections, participation in two rounds of PT for a total of 18 sessions (plus an HEP), and one arthroscopic surgery – resulting in lingering effects and pain. Additionally, Petitioner's medical records contain some descriptions of his pain on a ten-point scale, including his reports at the beginning of each round of PT (pre- and post-surgery). *See,* e.g., Ex. 5 at 5 (a March 6, 2019 PT note reporting pain at a 6/10 with a range of 5-7/10); Ex. 5 at 50 (a January 7, 2020 PT note reporting pain at a 6-10/10). Such notations support a moderate SIRVA upon onset, followed by a worsening of pain while Petitioner healed from surgery.

Petitioner complained of and exhibited reduced ROM to some degree throughout his treatment course, despite evidence of full ROM upon his first visit in early February 2019. *See,* e.g., Ex. 3 at 73-74 (a February 21, 2019 orthopedic examination showing reduced active ROM); Ex. 5 at 5-6 (a March 6, 2019 PT examination revealing "slight deficits in L shoulder ROM"); Ex. 3 at 69-70 (a March 28, 2019 orthopedic examination consistent with reduced ROM). Petitioner's mild or "slight" ROM limitations subsequently improved throughout 2019 – seemingly around the time of his receipt of his second steroid injection in March 2019; however, following his treatment with arthroscopic surgery, Petitioner's ROM restrictions returned. *See,* e.g., Ex. 3 at 66 (an April 19, 2019 orthopedic note that Petitioner's ROM "ha[d] improved to near normal"); Ex. 3 at 61 (a May 23, 2019 orthopedic examination showing full ROM); Ex. 5 at 50, 67 (January 7 and 24, 2020 PT examinations revealing diminished ROM and difficulty relaxing the muscles). The medical records thus show that Petitioner's limitations in ROM (albeit mild and not continuous) lasted through (at least) January 2020.

Further, the medical record preponderantly establishes (and Respondent does not explicitly dispute)[8] that Petitioner's treatment course and ongoing SIRVA symptoms continued for approximately 15 months – until January 24, 2020. *See* Opp. at 15. While Petitioner contends that he was forced to cease treatment as a result of the COVID-19 Pandemic, the filed record does not support this argument. Ex. 1 ¶ 20. In fact, Petitioner successfully sought treatment for various conditions unrelated to his SIRVA throughout the remainder of 2020 and beyond. *See,* e.g., Ex. 10 at 9-10, 112, 136. It is thus not credible that the Pandemic (which initially manifested in March 2020) was the reason he discontinued formal shoulder treatment. Rather, it is more likely than not that his

---

[8] Respondent's argument appears to contain an immaterial error – he contends that Petitioner's injury course was 15 months but that it lasted through May of 2020. Opp. at 18. However, he also notes that Petitioner completed his formal treatment in January 2020 – which is, in fact, 15 months post vaccination. *Id.* at 15.

symptoms were manageable without formal treatment *after* January 2020 (and hence before the limitations on care imposed by the Pandemic had even begun).

The severity and duration of Petitioner's pain, although significant (at times) and fairly lengthy, is also offset by one five-month treatment gap when Petitioner was contemplating surgery. *See Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093, at *7 (Fed. Cl. Spec. Mstr. May 21, 2021) (reducing an award due to a gap in care). When medical records filed for petitioners reveal comparable gaps, it is proper to weigh the reason for the gaps against evidence of a petitioner's purported pain. *See id.* Petitioner has not explained this gap in treatment in his affidavit or elsewhere. *See* Ex. 1. Arguably, the gap *could be* (at least partially) explained by Petitioner's receipt of a steroid injection in March 2019 (resulting in improved ROM on examination) and his desire to seek a second opinion for his ongoing treatment options (i.e., surgery). However, without additional context in the record offered by Petitioner, I cannot fully ascertain the explanation for the gap. Accordingly, such circumstances counsel in favor of interpreting the gap as evidence of the mildness or stability of the injury, which could be endured without medical assistance for a steady period of time.

In making his request for pain and suffering, Petitioner has mostly relied on cases wherein the award was either above or below his requested amount – thus making his reliance on such cases somewhat unhelpful. *Binette v. Sec'y of Health & Hum. Servs.,* No. 16-731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering); *Collado v. Sec'y of Health & Hum. Servs.*, No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for actual pain and suffering); *Cooper v. Sec'y of Health & Hum. Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for actual pain and suffering); *Bruegging v. Sec'y of Health & Hum. Servs.,* No. 17-261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019) (awarding $90,000.00 for actual pain and suffering). Indeed, only one of Petitioner's cited cases received the requested award in the instant claim. *Dobbins v. Sec'y of Health & Hum. Servs.*, No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for actual pain and suffering). Nonetheless, the overall severity and duration of the injury at issue herein is ultimately distinguishable from Petitioner's cited comparable decisions.

For instance, in *Binette* (the case with the highest award out of Petitioner's cited comparables - $130,000.00), while the 24-year-old petitioner did not undergo surgery, this was because the injury was considered inoperable. *See* 2019 WL 1552620. More so, *Binette's* injury was considered permanent. *Id.* Although Petitioner here reported significant pain at the end of his somewhat aggressive treatment course (6-10/10) (Ex. 5 at 67), there is insufficient evidence in the medical records that any of treaters considered

14

his injury to be permanent. He also did not seek or require ongoing care (despite a report of pain at the conclusion of his treatment course) – thus entitling him to a significantly lesser award than that awarded to the *Binette* petitioner.

Likewise, in *Dobbins* (wherein the requested amount of $125,000.00 was awarded for pain and suffering), the petitioner experienced a more severe injury. *See* 2018 WL 4611267. Indeed, the petitioner sought treatment within three weeks of the injurious vaccination, required surgery six weeks post vaccination, treated with 32 sessions of PT, and experienced *severe* limitations in ROM. *See id.* The *Dobbins* petitioner also demonstrated personal circumstances that warranted a higher award, including that she was caring for her terminally ill mother at the time of her treatment and that she experienced limitations in playing tennis and painting. *Id.* Petitioner here delayed seeking treatment for his shoulder pain for over three months post vaccination, did not undergo surgery for over one year into his treatment course, and only experienced "slight" limitations in ROM therefore entitling him to a lower award. Additionally, Petitioner did not describe specific, similar, or unique personal limitations caused by his vaccine-related injury sufficient to justify his requested award. *See generally,* Ex. 1.

The remaining cases relied upon by Petitioner are more factually comparable (albeit not entirely on point). But those petitioners all received lower awards than what is requested in this case. For instance, the *Collado* petitioner (awarded $120,000.00) sought care within two weeks of vaccination, treated for seven months, rated her pain severely at a 10/10 upon vaccination (and consistently for five months prior to her surgery), and she experienced a noted 40% improvement following her treatment course. *See* 2018 WL 3433352. Also, the *Collado* petitioner underwent a more invasive, open surgical procedure compared to Petitioner's arthroscopic surgery. *Id.*

*Cooper* (awarded $110,000.00) is distinguishable as well. That petitioner treated for more than two years and nine months (with specialized treatment including a chiropractor and massage therapy), but still exhibited residual pain and diminished ROM following treatment. *See* 2018 WL 6288181. The *Cooper* petitioner also exhibited severe limitations in ROM even two years into her lengthy total treatment course (33 months versus Petitioner's 15-month course). *See id.* While that claimant did not undergo surgery, she received a higher award than other non-surgical SIRVA cases because she successfully demonstrated that her injury greatly impacted her personal life – including with sailing and an active lifestyle, which was the foundation of her marriage. *Id.* Petitioner here has not made a comparable showing.

It is the case that more often than not, I deem a six-figure award appropriate in SIRVA cases where surgery was required. But there is no hard and fast rule to this effect.

*See Gray v. Sec'y of Health & Hum. Servs.,* No. 20-1708V, 2022 WL 6957013, at *5 (Fed. Cl. Spec. Mstr. Sept. 12, 2022) (stating that "an award of at least $100,000.00 is not automatically appropriate for all SIRVA injuries simply because arthroscopic surgery was involved."). And I have awarded less than $100,000.00 in several cases featuring surgery, including one of Respondent's cited cases, where the specific circumstances of the claim merit a lower award. *See,* e.g., *Hunt v. Sec'y of Health & Hum. Servs.,* No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 for past pain and suffering); *see also Shelton,* 2021 WL 2550093 (awarding $97,500.00 for pain and suffering wherein the petitioner underwent surgery but delayed seeking treatment for five months post vaccination, followed by an additional three-month delay before seeking further treatment).

The cases Respondent relies upon for support (awarding greater compensation than that recommended by Respondent in this case) provide guidance for a fair award in the instant claim. The petitioner in *Felland,* for example, treated within 34 days of vaccination, for a total of one year. *Felland v. Sec'y of Health & Hum. Servs.,* No. 20-406V, 2022 WL 10724100 (Fed. Cl. Spec. Mstr. Sept. 6, 2022) (awarding $100,000.00 for past pain and suffering). *Felland* received care similar to Petitioner, including over-the-counter anti-inflammatories, two steroid shots, and one arthroscopic surgery. *See id.* The *Felland* petitioner likewise only suffered from slightly limited ROM. *Id.* But Mr. Shields delayed seeking treatment for over 100 days – three times longer than the *Felland* petitioner, and comparably had one MRI (versus *Felland's* two MRIs). A slightly lesser award is therefore appropriate in Petitioner's case.

Overall, the best comparable offered in this case involved a $95,000.00 past pain and suffering award. *See Hunt*, 2022 WL 2826662.[9] The *Hunt* petitioner sought treatment for shoulder pain within roughly three weeks of vaccination, received three steroid injections (providing relief correlating to small gaps in treatment), rated her pain ranging from a 1-8+/10 throughout her treatment course, underwent 19 total PT sessions (pre- and post-surgery), and underwent one arthroscopic procedure. *Id.* Both the *Hunt* petitioner and Petitioner in this case treated for a total of 15 months and experienced periods of little to no pain – as evidenced by some gaps in treatment. Therefore, the same sum is properly awarded.

---

[9] Although at SPU "Motions Day" proceedings I often chastise Respondent for over-reliance on *Hunt,* this matter presents exactly the kind of circumstances where it stands as a reasonable comparable for guidance.

## Conclusion

**In view of the evidence of record, I find that there is preponderant evidence that the onset of Petitioner's injury, specifically shoulder pain, was within 48 hours of his vaccine and he has otherwise satisfied the requirements for a Table SIRVA claim. Further, based on the evidence of record, I find that Petitioner is entitled to compensation.**

I also find that, for all of the reasons discussed above and based on consideration of the record as a whole, **$95,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[10]

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[11]

**IT IS SO ORDERED.**

                                        **s/Brian H. Corcoran**
                                        Brian H. Corcoran
                                        Chief Special Master

---

[10] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[11] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.